UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

HIGHVIEW ENGINEERING, INC., et al.                                    PLAINTIFFS

v.                                                    CIVIL ACTION NO. 3:08CV-647-S

UNITED STATES ARMY CORPS OF ENGINEERS                    DEFENDANT

**<u>MEMORANDUM OPINION</u>**

This action involves a procedure known as "mitigation banking," an environmental preservation activity supposedly designed to protect the nation's wetlands.  In accordance with the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, the United States Army Corps of Engineers (the "Corps") requires that persons or business whose activities will adversely impact wetlands in one place compensate for the damage by establishing a new wetland elsewhere that will replace any lost biological functions.  "Mitigation banking" is one way a person or entity can fulfill this demand: It pays a third party (a mitigation bank) to create a new wetland so that the adverse impact of the person or entity's activity will not result in a net harm to the environment.  *See*  2010 U.S. Dist. LEXIS 50987 (W.D. Ky. May 24, 2010).

The facts of this case have been set out at some length in our prior opinions.  *Id.*  We therefore provide only an abbreviated version here.  Dr. Darroll Hawkins owns Highview Engineering, Inc., a Kentucky environmental engineering firm. The Wetland Bank of Kentucky ("WBK"), in which Highview was a partner, was party to a contract with the Corps.  WBK apparently failed in its duties under that contract, and the Corps sued for breach of contract and of

the duty of good faith, negligent misrepresentation, and unjust enrichment. The parties settled the Corps' claims for $70,000, and a Consent Judgment was entered on March 30, 2006.

In April 2007, Hawkins began working with Dr. Phillip J. Harris, an environmental enhancement entrepreneur, to develop a proposal for a new wetlands project involving the Corps. Hawkins submitted the proposal on Harris's behalf.  Approximately 9 ½ months later, after a number of unsuccessful attempts to contact the Corp regarding the status of the proposal, a Corps Project Manager, Katie McCafferty, contacted Harris to discuss the proposal and a meeting was scheduled for April 3, 2008 with Harris, Hawkins and McCafferty slated to attend.  The morning prior to the meeting, Harris received a cell phone call from McCafferty asking to meet with him that day.  They met at Cracker Barrel Restaurant in Paducah, Kentucky, shortly after the call.  Hawkins was not invited to attend that meeting.  At the meeting outside restaurant, McCafferty allegedly informed Hawkins that Ann Nunn, an attorney with the Corps, had stated that (according to the complaint) "she did not want any wetlands mitigation bank proposals in which Dr. Hawkins played a role." (Compl. ¶ 17.) Harris was also allegedly informed that other Corps employees were "uncomfortable" with having Hawkins involved in any new projects, and it was "suggested" that Harris hire a different consultant. (*Id.*)  The meeting with Hawkins, Harris and McCafferty scheduled for the following day did not occur.  Harris purportedly took McCafferty's suggestion and ended his business relationship with Hawkins. Additionally, the Corps also allegedly removed Hawkins and Highview from its published "Wetland Consultant List."[1] Hawkins claims that he and his company were thus debarred from working on any Corps projects.

---

[1] We need not proceed further with the claim that the plaintiffs were removed from the Wetlands Consultant List.  It was established in Hawkins' deposition that he was never on that list.  Hawkins Depo., p. 98, 101.  Hawkins stated that he was on a more general consultant list with the Corps, but he has not produced any evidence regarding such a list nor has he amended his claim to allege removal from it.

Hawkins and his company filed suit alleging four causes of action: violation of their Fifth Amendment right to due process of law; violation of their First Amendment right to freedom of association, interference with prospective and existing contractual relationships; and defamation. The first two claims were alleged against both defendants; the latter two were asserted only against Nunn in her individual capacity.

In a prior opinion and order, 2010 U.S. Dist. LEXIS 50987 (W.D. Ky. May 24, 2010), the court dismissed all of the plaintiffs' complaint with the exception of Count I, as asserted against the Corps, alleging that the plaintiffs were *de facto* debarred from doing business with the Corps without receiving constitutionally guaranteed procedural protections. The Corps is not permitted to debar a person or entity from competing to win government contracts without affording the process due under the Fifth Amendment. *Transco Secur., Inc. v. Freeman*, 639 F.2d 318, 321 (6th Cir. 1981) (*citing Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953 (D.C. Cir. 1980)) A bidder's liberty interest is impacted when he is denied the opportunity to bid on government contracts on the basis of a charge of fraud or dishonesty. *Id.* The Fifth Amendment entitles such a bidder to certain procedural safeguards, including notice of the charges, an opportunity to rebut them, and sometimes a hearing. *Id.*

We previously found that the plaintiffs' debarment claim in this case had "at least some superficial appeal" on the merits, *id.* at *18, slip op. at 11, and we held that this court had jurisdiction to entertain the claim. (DN 35). The parties have now filed cross-motions for summary judgment on this remaining claim.

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v.*

- 3 -

*S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Plaintiffs argue that they have for all practical purposes been debarred from working with the Corps, without any process whatsoever. The Corps concedes that no process was afforded the plaintiffs.  It argues that no process was due, as no *de facto* debarment occurred.  Such *de facto* debarment claims are not unknown to the federal courts. *See*, *e.g.*, *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877 (2d Cir. 1996) (acknowledging that a state employee's letter instructing agencies to reject all proposals by the plaintiff constituted a *de facto* debarment subject to due process requirements, but finding those requirements adequately fulfilled in the instant case);  *Old Dominion Dairy Prods.*, 631 F.2d at 961 n.17 (stating that the plaintiff's "claim of *de facto* debarment is not frivolous" but passing over the issue as not properly presented to the court); *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 215-16 (2001) ("Two options

exist to establish a *de facto* debarment claim: (1) by an agency's statement that it will not award the contractor future contracts; or (2) by an agency's conduct demonstrating that it will not award the contractor future contracts." (*citing CRC Marine Serv., Inc. v. United States*, 41 Fed. Cl. 66, 84 (1998)); *Leslie & Elliott Co. v. Garrett*, 732 F. Supp. 191, 195, 198 (D.D.C. 1990) (stating that a court can find a *de facto* debarment where there is either "a statement that the agency will not award a contract to the disappointed bidder in the future" or "conduct of the agency" that indicates the existence of a *de facto* debarment, and concluding that the plaintiff had in fact been *de facto* debarred).

The plaintiffs contend that their debarment constituted unlawful agency action under the Administrative Procedures Act (APA"). Under the APA, 5 U.S.C. § 706, the court reviews final agency actions under an "arbitrary and capricious" standard to ascertain whether those decisions were made within the bounds of reasoned decision-making. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 105 (1983). The Corps urges that there was no *de facto* debarment and thus no final action to review. This court concluded in an earlier opinion that, in the event a *de facto* debarment was proved, such conduct would constitute final agency action triggering such review under the APA. (DN 35, p. 4 *citing Air Brake Sys. v. Mineta*, 357 F.3d 632, 639 (6th Cir. 2004); *Cf. Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers*, 714 F.2d 163, 168 (D.C.Cir. 1982)(in dictum, *de facto* debarment constituted reviewable final agency action).

Previously, we denied the Corps' motion to dismiss, finding that the plaintiffs had stated a claim of *de facto* debarment. (DN 35, p. 5). The parties have now moved the court to test the claim under the summary judgment standard and determine whether *de facto* debarment occurred. We

conclude that the undisputed fact are sufficient to establish that the Corps is entitled to summary judgment as a matter of law.

Plaintiffs must meet a high standard when seeking to prove a *de facto* debarment claim. "To succeed, [the plaintiff] must demonstrate a systematic effort by the procuring agency to reject all of the bidder's contract bids." *TLT Const. Corp. v. U.S.*, 50 Fed.Cl. 212, 215 (2001). *De facto* debarment may be proved (1) by an agency's statement that it will not award the contractor future contracts; or (2) by an agency's conduct demonstrating that it will not award the contractor future contracts. *TLT Const. Corp.*, 50 Fed.Cl. at 216.

The plaintiffs contend that comments made to Harris by McCafferty on April 2, 2008 establish *de facto* debarment of Hawkins from future contracts with the Corps. Harris testified that he made notes attempting to accurately document what occurred during the meeting. He took notes, and sent e-mails to a number of people in the days following the event, including more than one to Hawkins, recounting the conversation. Harris was admittedly very angry over the 9-month delay of his proposal, and what he perceived to be a veritable "squeeze play"[2] by the Corps.

Harris' various versions of what McCafferty said to him are found in (1) purported contemporarily recorded notes, (2) an e-mail to Hawkins the following day, (3) an e-mail to Hawkins sent a week later, and (4) his deposition in 2011. What was actually expressed to Harris during the April 2, 2008 meeting is not entirely clear. However, Harris was *not* told that "the Corps wanted no proposals in which Hawkins played a role."

---

[2] Pressure exerted to obtain a concession or achieve a goal. Webster's II, New Riverside University Dictionary (1994).

The most damning version of the encounter with McCafferty is contained in Harris' e-mail sent to Hawkins a week after the meeting.  It is in this e-mail and his notes that Harris made this representation.  In the 04/10/08 e-mail to Hawkins, Harris stated that

> In our face-to-face on the porch at Cracker Barrel on April 2nd, Katie told me right away, before taking up any other subject, that Ann Nunn had called her on April 1st and said she wanted no proposals in which Dr. Hawkins played a role.  Later during the same face-to-face, but this time in my car, and in answer to the question, "Do you mean I have to fire him?" she said, "That's one of your options."  McCafferty went on to say that I could look at other consultants.  She didn't specify the names of other consultants until later that afternoon, **in an e-mail**.  (How and when maybe aren't such a big deal, but this is the accurate sequence of events, for the record, so to speak.
>
> Katie also mentioned that she had talked this "discomfort over Dr. Hawkins's involvement" situation with Ricketts and also a second superior before meeting with me the. [sic]  Katie said she, Rickets and the third person all agree–they too, were uncomfortable.  It was then that I asked if my using the Hawkins design **might** be disallowed and she said "yes."  I never got a fix on the magnitude or justification for the discomfort.

4/10/08 Harris.  In this e-mail, Harris also assists Hawkins with a draft of a letter Hawkins proposed and ultimately sent to Nunn addressing the purported "blacklisting."

Harris testified that he stopped and made notes in the parking lot of Kentucky Oaks Mall immediately after meeting with McCafferty.  He stated that this was an attempt to write down "everything I could remember, including her behavior, her rudeness, her condescension."  (Harris Depo., p. 56).  He stated in his notes, in pertinent part:

> Then she joined me and introduced the discussion by saying that yesterday, 04/01/08, she had gotten a phone call from Ann Nunn, an attorney with the Corps of Engineers in Louisville.  Nunn had said the Corps of Engineers did not want any new proposals or anything else from Hawkins.  McCafferty smiled when she said it was even questionable that I would be able to use the design he produced last summer.  She gave me no reason why.  She did, however, volunteer that she had discussed this with her boss, Mike Ricketts, and another Corps of Engineers official, also her superior, and that all parties involved were comfortable with this exclusion."

Harris Depo., pp. 63-65.

In an e-mail to Hawkins sent the day immediately following the meeting, however, Harris described a somewhat less direct communication by McCafferty, but termed it "blacklisting":

> On Wednesday, April 2, I was having lunch with a banker and got a cell phone call. It was Katie. She was in the area and could we meet. We were sitting in white rockers at Cracker Barrel within 20 minutes. After introductions, she said that the day before, she'd gotten a phone call from Louisville District attorney Nunn who told her the legal department was uneasy with entertaining a proposal in which you were a participant. I asked if this meant that a plan you produced might not be accepted on the basis of the former fine, even if it were a good plan. She said it might *not* be accepted, she didn't know. I said that you might be innocent and that your partner might be the sole culprit in the case that led to the fine. And I mentioned that the Corps was sticking its neck out for a discrimination suit. I don't recall her response, but it was neither one of concern nor did it suggest she felt any threat to herself. I guess she's only a messenger of a decision by the legal department, perhaps one made by Nunn alone...

> Katie later e-mailed me a list of other individuals who had worked on wetland mitigation banks. I don't know how long it's going to take to re-institute yourself, but certainly I'd rather continue with you than some stranger. No one seems to have major complaints about your design, and that they did say seemed picayune and even small, especially the part about withholding credits for acreage under the power lines. I'm not making phone calls to anyone else right away, and would appreciate knowing if Nunn's blacklisting of you can be resolved quickly.

04/03/08 Harris e-mail to Hawkins.

When pressed in his deposition about the variances in his recollection of the McCafferty encounter, the following exchange took place:

> Q: And I want to be sure that we are clear here. The second paragraph, the one that's highlighted there, "Katie told me right away before taking up any other subject that Nunn calls her on April 1st and said she wanted no proposals in which Dr. Hawkins played a role." Now I thought you had testified earlier in your April 3rd e-mail that they were uneasy and that you were never told that they would not entertain proposals with Dr. Hawkins?

[Objection as to form]

Q:  It's correct, they never told you they would not entertain a proposal with Dr. Hawkins?

A:  That's true.

Q:  All right.

A:  But they had to be careful not to say that, didn't they?

Q:  Well, this statement here where you say that she, being Ann Nunn, wanted no proposals in which Dr. Hawkins played a role is not a quote of anything that was said.  It's your speculation or interpretation of the events.

[Objection as to form]

Q:  It's not a quote, is it?

A:  It is not.  It is not in quotes.

Q:  And it was not said to you that they wanted no proposals in which Dr. Hawkins played a part or a role?

A:  They did not use a declarative sentence to express that.  It was inflection of voice and tone.

Q:  And that's what this comes down to is inflection of voice, tone, and your interpretation of that?

[Objection as to form]

A:  My experience with the English language and dealing with 70 patients a day for 30 years.

Q:  You inferred that, but it was not said?

[Objection as to form]

...

A:  I will say for the sake of these proceedings and the sake of truth that no one told me I had to fire Hawkins.  No one said he was bad.  No one said he was the anti-Christ.  But the inflection and the context in which things came up said it all to me

> when Ms. McCafferty said "That's an option." She said it in an expansive way with
> an inflection on the last syllable. It was, "It is apparent to me. Isn't it apparent to
> you?" That was the context in which I heard it. And I believe it to this day.

Harris Depo., pp. 119-122.

When the meeting with McCafferty occurred, Harris was already dubious of the delay in the review of his proposal. He interpreted McCafferty's comments and mannerisms to indicate that Hawkins was being "blacklisted" by the Corps because of the Corps' prior lawsuit against him. Approximately 9 ½ months had already elapsed without any communication from the Corps. Nobody had returned his calls or responded to his written communications. A meeting had been scheduled in which Hawkins was to participate, only to have the meeting preempted by a one-on-one meeting between McCafferty and Harris the day before.

Harris ultimately concluded that his project would not be accepted if he continued to use Hawkins as his consultant. Despite the fact that Hawkins received a letter from the Corps stating that Hawkins was free to work with anyone and that others were free to work with him on wetlands projects, Harris chose to replace Hawkins' firm with another firm which had previously been successful in wetlands projects with the Corps. Harris testified that he viewed the statements in the letter to Hawkins as "worthless," (Harris Depo., p. 125), and that the risk of further delay or rejection of his proposal was too great to continue his relationship with Hawkins. He stated in an e-mail in late April in which he severed his relationship with Hawkins that

> My attorney spoke with Nunn last Wednesday, April 23, and since then he and I have
> exchanged e-mails and had telephone calls about this. It appears that while you are
> not barred from working on the project, your involvement in the project would
> produce heightened scrutiny by the Corp. [sic]. This is likely to slow down my
> project, as it appears it already has, and make things overall more difficult. Darroll,
> I've lost time and money so far, and the risks of having more of the same are too
> high for me. At this stage of life, it's a bit much for me to wake up and worry about
> what the next setback will be. It has taken too long to get only this far, and I want

to enjoy the steps yet to be taken to establish my mitigation bank. McCafferty sent me a list of other contractors, and today I plan to research them and select one to replace you. This is a business decision, not a personal one, except that it makes me sad. I wish you every bit of happiness and success down the road.

A finder of fact reasonably could find that Harris had been presented with a *fait accompli* that his project would be rejected or would be mired in the process under "additional scrutiny" if he continued to utilize Hawkins as his consultant. It could as reasonably be concluded that McCafferty simply armed Harris with the facts from which he concluded that it was a bad business decision to pursue approval of his project with a consultant whose history would draw significant scrutiny by the Corps. Such a determination would first require a trial on the facts. However, no trial is warranted as we conclude that the claim would fail as a matter of law in any event.

The sum and substance of the plaintiffs' claim is that it was clearly implied to Harris that Hawkins' participation in this project was unwelcome. There was nothing stated or demonstrated by the Corps indicating that it would not grant Hawkins future contracts, beyond the one contract then before it. Harris' impressions concerned only the fate of his project, and he acted in accordance with his belief about the outcome of his project should he choose to proceed with Hawkins on board. In fact, the Corps represents that McCafferty fully intended to send the message that Hawkins' participation jeopardized the rate at which the approval process might progress or possibly its ultimate approval. However, McCafferty flatly denied making the statement that Ann Nunn told her that the Corps wanted no proposals in which Hawkins played a role. (McCafferty Depo., pp. 6-8). Harris admitted that the statement was not a quote. (Harris Depo., p. 120). Rather, Harris stated that it was *his opinion* that Hawkins was being blacklisted and it was *his opinion* that he was being blackmailed into hiring someone else. (Harris Depo. p. 102). Harris was not told that the Corps

would not accept or consider proposals involving Hawkins. (Harris Depo., p. 119). He was not told that the proposal presently submitted by Hawkins on behalf of Harris would not be approved. Harris was not told that he was prohibited from using Hawkins and was not told to terminate his relationship with him. (Harris Depo., pp. 25-26).

It is clear that the plaintiffs cannot establish *de facto* debarment through an agency statement that it would not award Hawkins future contracts. Harris admitted that no statement of that breadth was made to him.

Even if it were proven at that Hawkins was prevented from obtaining the Harris contract with the Corps because he was removed from the project due to pressure placed on Harris by the Corps, such a finding would be insufficient to carry the day. Preclusion from a single contract is insufficient to establish *de facto* debarment. *Dynamic Aviation, supra.; TLT Const. Corp., supra.; National Career College, Inc. v. Spellings*, 371 Fed.Appx. 794, 2010 WL 1041145 (9th Cir. March 22, 2010); *Redondo-Borges v. U.S.Dept. of Hous. and Urban Dev.*, 421 F.3d 1, 8-9 (1st Cir. 2005).

The facts of this case can are readily distinguishable from the facts in *Dynamic Aviation v. Department of Interior*, 898 F.Supp. 11 (D.D.C. 1995) on which the plaintiffs heavily rely. In *Dynamic Aviation*, the plaintiff had his aviation "cards" revoked for a period of one year. A pilot could not be re-issued "cards" until his pilot skills had been re-tested and his helicopter had been re-inspected. The Office of Aviation Services refused to perform the tests and inspection until a feral bureau specifically requested his services, but a pilot could not be awarded an informal contract unless he was "carded." The court found that this placed the pilot in a "Catch-22" where he could not obtain the needed card unless his services were requested, but his services would not be requested unless he had a card. The court stopped short of finding *de facto* debarment. Rather,

summary judgment was denied, as the case presented genuine issue of material fact.  In *Dynamic Aviation*, the agency prevented the pilot from meeting a legal prerequisite to participation in the bid process for contracts.  Here, the plaintiffs have established that the Corps indicated that the Harris project would likely face a more difficult road to approval with Hawkins' involvement.  There is simply no evidence, as there was in *Dynamic Aviation*, of a systematic effort by the agency to reject all of the plaintiffs' contract bids.  *Dynamic Aviation*, 898 F.Supp. at 13; *National Career College v. Spellings*, 371 Fed.Appx. 794, 796 9th Cir. 2010); *TLT Const. Corp.*, 50 Fed.Cl. at 215, *Old Dominion Dairy Prods., supra., Leslie & Elliott Co., supra.*

As the plaintiffs cannot establish *de facto* debarment, there was no final agency action subject to review under the APA.  The plaintiffs are thus unable to prove their claim, and Count I as asserted against the Corps must be dismissed.

Summary judgment in favor of the Corps will be granted and summary judgment in favor of Hawkins and Highview will be denied.  A separate order will be entered in accordance with this opinion.

March 29, 2012

**Charles R. Simpson III, Judge**
**United States District Court**

- 13 -